## SHINE *vs.* REDWINE AND WIFE.

1. Where the purchase is made by a trustee on his own account of the estate of the *cestui que trust*, although sold at public auction, it is the option of the *cestui que trust* to set aside the sale, whether *bona fide made* or not: Provided, the heirs make their election within a reasonable time.

2. If an administrator illegally sells the property of his intestate's estate and become himself the purchaser, and the heirs elect, to rescind the sale, he will be decreed to convey them the property remaining in his hands unsold, and to account for that which he has disposed of by gift or resale, at the highest value.

3. The *ex parte* orders of the Ordinary are no protection to the administrator for his illegal acts.

4. If a man dies intestate, leaving his wife and daughter his only distributees, the husband of the widow is a competent witness to testify in a suit at the instance of the daughter and her husband against the administrator.

In Equity, in Twiggs Superior Court.    Tried before Judge LAMAR, at September Term, 1859.

This was a bill filed by the defendants in error against the plaintiff in error, making the following allegations:

That in 1837, Robert F. Glenn died intestate in Twiggs county, leaving his widow (now Mrs. Shadrach Ware) and the present wife of complainant Redwine, his only heirs at law; that he left a large estate, consisting of lands, negroes, stock, etc., of which Shine, in January, 1838, having qualified as Glenn's administrator, possessed himself; that Shine did not administer said estate in the manner pointed out by law, nor did he make legal or true return of his actings and doings; that he caused the perishable property to be sold, and bought most of it himself, and caused at least six of the negroes to be sold, and returned them as bought by other persons, whilst, in truth, four of them, if not more, were bid off for said Shine himself, and taken by him; that said administrator has rendered no account of the lands, and has misappropriated the *choses in action* belonging to the estate; that several years subsequent to 1838, the said defendant without any legal authority, caused the balance of the negroes to be sold, and so managed as to become himself the purchaser for a merely nominal price, making no returns of the prices paid, nor of hire received during the years inter-

vening between Glenn's death, and said sale; that complainant, Redwine's said wife, was then a minor, and very young, having no power to secure or protect her rights, and being entirely under control of defendant until her marriage in 1856; that defendant is still in possession of said estate, especially the negroes and their increase, which, with the interest, hire, etc., are worth $50,000 00 or other large sum; that on account of the concealment practiced by defendant, complainants are unable to discover the quantity, value or character of said estate, without resorting to defendant's conscience.

By an amendment, complainants further allege: That if any order of sale was ever procured by defendant, it was at an Adjourned Term of the Court, and before notice of intention to apply for such order had been advertised the period required by law; that said sale was not advertised as required by law, but six of the negroes were sold on the day after the order was granted, and returned by Shine as bought by one Harrison; when, in truth, five of the said negroes, at least, were bid off for said Shine, and went at once into his possession; that until January, 1845, defendant held the balance of the negroes as the property of said estate, when he caused eight other negroes to be sold without giving any notice of intention to apply for an order to sell, or, in fact, obtaining an order for that purpose—no order having been granted to sell any part of said estate since the order of April 30th, 1838, which complainants claim was *functus officio* after the sale first had under it; that said sale was fraudulent and void for the further reasons that the negroes were bid off by Henry Bunn for defendant, (although defendant returned them as bought by Bunn for himself), and were sold for cash, and without notice, and at a time when defendant thought they would sell cheap—the creditors of the estate having been previously paid off, and no division being necessary; that complainant, Redwine's wife, had no guardian, and if a division had been necessary, a sale of said negroes was not requisite to make it; that on the 5th day of May, 1845, defendant procured the Court of Ordinary to pass an order, which, after reciting that he had "fully administered," and had legally published a citation for letters of dismission—no objection having been filed—ordered the Clerk to grant letters of dismission, and to per-

mit said Shine to retain money to pay the taxes of the estate for the year 1845; that said order of dismission was fraudulent and void, because notice of intention to apply for it was not published six months; no division had taken place; the estate had not been fully administered; no return even of said last-named sale was made until the day said order was granted, and no opportunity, therefore, had been given for parties interested to examine it.

The bill prays that said orders and the sales under them be set aside, and that defendant be brought to a full settlement with complainants; that he be decreed a trustee for complainants in respect to the property purchased by him, and be decreed to deliver up the negroes still in his possession, and to account for the present value of those he has disposed of, with hire.

The defendant, in his answer, admits that he administered on the estate of said Glenn as stated; that Mrs. Redwine and her mother are the only heirs at law, and that the former was a minor up to the time of her marriage in 1856; denies that said Glenn died seized of any lands, and denies that he, defendant, has failed to account for the *choses in action*, etc., of said estate. As to the negroes, the answer states that in May, 1838, defendant, after due and public notice, brought to sale six negroes of said estate, viz.: Bill, Harriet, Lydia and child, Guilford and Henry; the sale was perfectly fair in all respects, and all the negroes were bid off by G. L. Harrison, except Harriet, who was bought by Gus McCrea; that defendant got his friend Harrison to run up said negroes to a higher figure than any one else would bid, and the prices paid were the highest market value at the time, to-wit: for Bill, aged 10 or 12 years, $455 00; Lydia, aged about 30 and child, $861 00; Guilford, aged 13 or 14, $600 00; and Henry, aged 27 or 28 years, $1,100 00; that defendant, not having means of his own to pay the debts of said estate, was compelled to sell Bill and Lydia and child to raise money for that purpose; made no profit on Bill and sold the other two at a loss; does not know whether either of said negroes are now living or dead; that he paid for Guilford the amount stated, and has had him ever since, and that said Guilford is now worth $1,000 00, and has averaged, since 1838, $90 or $100 00 per annum; that he paid the price bid for Henry, who is growing old, and now worth $600 00

Shine *vs.* Redwine and wife.

or $700 00—average hire since 1838 would reach $125 00 per annum. The answer further states, that in January, 1845, defendant made sales as follows of negroes belonging to said estate, to-wit:

Mary, an old woman, 45 or 50, and her child Wiley, to H. Bunn, $300 00; Pool, a boy aged 10 or 11 years, also bid off by H. Bunn, at $250 00; Henry, a boy aged 19 years, to William Herring, (actual sale,) $400 00; Harriet, a girl aged 10 or 12 years, bid off by H. Bunn at $299 00; Charlotte, a girl about 9 years old, bid off by H. Bunn, at $365 00; Esther, a girl aged 12 or 13 years, bid off by H. Bunn at $250 00; Charles, a boy aged 8 or 9 years, bid off by H. Bunn at $155 00; that defendant kept all but Poole, Charlotte and Henry; that in 1850 he gave Harriett, then worth $500 00 or $550 00, to his son, Daniel W., and she, with her six or seven children, is worth now about $3,000 00, and but little, if anything, for hire; that Harriett and children constitute part of the estate of said Daniel W., who is dead; that in 1855 or 1856, he gave Esther to his daughter, Mary Faulk, and she, with her two small children, is now worth $1,500 00 or $1,600 00, and nothing for hire at this time; but her hire for seven years averaged about $30 00 per annum; that Charles is still in defendant's possession, and is worth $1,000 00 and $125 00 for hire, and has averaged $50 00 per year, for hire, for thirteen years. The answer denies that defendant bought any of said negroes at an under-value; says the prices were the highest market value, and in all cases where he could get an advance at private sale, he charged himself with the advance; that he acted in good faith, doing his best to make the property bring its full value; that he procured the services of Henry Bunn to run up the negroes for him to save the estate from loss, times being hard and property selling low; that having disposed of Pool and Charlotte at an advance of $184 00, he promptly charged himself with the advance, and made return accordingly to the Ordinary; that he offered Mary and her child Wiley at cost, but could not get it; says the sale in 1845 was made under the order granted in 1838, all the negroes not being sold in the latter year because defendant hoped the debts would not require it, and he desired to save some of said negroes for his daughter (deceased's widow) and grand-child (Mrs. Redwine); that another sale being neces-

sary to pay debts, he applied to the Court in 1845 for leave to sell, when one of the members of the Court announced from the Bench that a new order was unnecessary, and the previous order was then examined and found sufficient, and defendant acted under it; says he did make true returns of the sales, and the hire of said negroes, and has fully accounted for the proceeds of all the property, and is not in default to said estate one dollar; that as to advertising said sale, he was advised and believed that it was legal for an administrator to advertise in anticipation of an order of sale, and if he erred it was an honest mistake, and did not injure any one; that as to the debts against said estate having been paid before said sale, it is so far from being true, that to save the property from sacrifice, he had to advance his own private funds to pay said debts, as his returns will show; that as to the orders for sale of said property, if there was anything illegal, it was the act of the Court and not of defendant, who gave orders for notices to be given according to law, and believed then, and believes now, the law was complied with; that as to their being granted at an adjourned term, the Court inquired of its Clerk respecting the regularity of the proceedings, notice, etc., who responded, that all was fair, regular and right, and the Court, acting upon the information thus received, granted the order; that it is true the Court granted defendant final letters of dismission as stated in the bill which defendant pleads in bar of complainant's suit; that as to the charge of fraud in obtaining said dismission, dependant applied to the Court from time to time for advice, and as to notices and all matters of form, followed the advice and direction of the Court—Lewis Solomon, the Clerk of said Court, a man justly entitled to confidence, reporting all correct, and defendant believing then and now that the law was strictly complied with; there was no fraud or concealment whatever by defendant. Embodied in the answer is the following statement of defendant's returns:

First return, including negro hire........... ........$1,602 17
Sale of negroes first Tuesday in May, 1838..:....... 3,671 00
Solvent notes and accounts............................ 176 00

$5,449 24
Paid out as per return................................. 7,151 26

Balance due administrator....................... ......$1,702 02

Shine *vs.* Redwine and wife.

From which deduct, as per return May, 1840...... | 53 50
---|---
| $1,648 52
Add debits as per return May 2d,.1841. ........... | 179 83
Return of 1844......................................... | 4 76
Debits for 1842, embraced in return of 1844...... | 3 43
"      "   1843,   "      "      "      "      "   ...... | 4 30
Interest on $1,648 52, from May 28th, 1840, to |
January 7th, 1844.................................. | 528 73
Interest on $179 83, from May 2d, 1841, to 1845 | 46 49
| $2,416 06
Com'ssions for receiving and paying out $7,151 26 | 357 56
| $2,773 62
Less sale of negroes January 7th, 1845, deducting |
expenses ............................................ | 2,355 89
Due administrator, January 7th, 1845............... $ | 417 73

The answer prays a decree in favor of defendant for the said balance.

By amendment to his answer, defendant states that all the negroes bid off at the two sales by Harrison and Bunn were bought for him; that Mary, now 60 years old, is probably worth $100 00 to $150 00, and has averaged $50 00 for hire; her son Wiley, now 14 or 15 years old is worth $1,000 00 or $1,200 00, and has averaged for hire, for last five years, $40 00 to $65 00; Pool was sold to Robert Paul by defendant at a profit; Charlotte was sold to A. McAllen by defendant, and now has 3 or 4 children; Harriet, with her two children, given by defendant to his son, Daniel W., in 1850, then worth $1,100 00, (now $2,600 00) and she has had 5 children since, whose ages range from 7 down to 2 years, and they are worth $1,550 00—whole family, by reason of the recent rise in negroes, worth some $4,050 00; that Esther and infant child were worth in 1855 or 1856, when given to defendant's daughter, about $900 00, and her hire from 1845 to 1855 averaged $70 00 or $75 00; she has since had a child, and the family are now worth $1,400 00; Charles is now about 21, and worth $1,200 00—average hire for 13 years, $50 00—hire for present year, $125 00; that the sale of 1845 was necessary, because the widow had married Ware, and the estate had to be closed up, and if there was anything

irregular about granting the orders, defendant did not know it; that the sale in 1838 was advertised sixty days in anticipation of an order allowing the same.

On the trial of the case, the bill and answers were read to the jury, and complainants then introduced in evidence an exemplification from the Court of Ordinary of defendant's returns, which make return of the negroes bought for defendant at said two sales, as bid off and purchased by Harrison and Bunn respectively at the prices stated in defendant's answer.

Complainants then read in evidence the testimony of Shadrach Ware—defendant objecting, on the ground that Ware having married Glenn's widow, was interested. Ware testified, that he was in Marion (where the negroes were sold) on the day of sale, being 1st Tuesday in January, 1845, but did not attend the sale, because he did not think defendant was acting right; did not know the negroes until defendant bought them; that soon after the sale, defendant offered to sell him the negroes, but not thinking defendant was acting, or had acted right, he refused to have anything to do with them; thinks the sale was for cash, which was calculated to deter persons from bidding—times being hard and money scarce even with men of property; does not think the negroes brought their full value; knows defendant sold two of them at a considerable profit; negroes sold a year previous at 100 per cent. more than Glenn's brought; witness never expressed to defendant any dissatisfaction at defendant's conduct until 7 or 8 years after said sale, when he told defendant the hire of the negroes would have paid the debts of said estate, and that a sale was unnecessary.

Robert Paul testified for complainants: That he bought of defendant, in 1845, at private sale, a negro named Pool at $800 00; he is now worth $1,500 00, and $150 00 for hire; has averaged $115 00 to $120 00 for hire since 1845; that a negro woman of the description of Esther is now worth $1,300 00, her oldest child $400 00 to $500 00, and her youngest $200 00 to $250 00; their average hire from 1845 till now would be about $80 00 per annum; Harriet and children, as described in defendant's answer, are worth $5,200 00, and she, for two years after 1845, has been worth for hire $125 00 per year, and $25 00 or $30 00 per year for the intervening time; Charles is worth

$1,500 00, and his average hire per annum since 1845 would be about $110 00; Wiley is worth $1,500 00, and his average hire since 1845 would be $115 00; Henry, being a blacksmith, is worth now $1,800 00, and $200 00 per year for hire since 1845; Guilford is now worth $1,200 00, and his hire since 1845 has been worth $110 00 per year; that cash terms were calculated to drive off bidders in 1845; witness wanted to buy some of the negroes, and did not because they were sold for cash.

An agreement of counsel was then read in evidence, that A. McAllen, if present, would testify: That shortly after the sale in 1845 he bought the negro girl, Charlotte, of defendant at $400 00, which was then a fair price; that Charlotte has since had five children, and the family are now worth $4,500 00. It was also agreed that no hire should be claimed for Charlotte between the sale of 1845 and her resale. Here complainants closed.

Defendant introduced in evidence an exemplification of the entire record of the Court of Ordinary, touching his said administration, including the order of sale granted in 1838, and the letters of dismission granted in 1845, (complainants making no objection, with the understanding that the charge of the Court might be asked respecting the legality of said orders.)

Complainants' counsel here agreed to make no issue on the papers due the estate returned by defendant as insolvent.

James S. Miller testified for defendant: That he acted as auctioneer for defendant at both of said sales; the sales were conducted fairly, and the negroes brought fair prices.

Henry Bunn testified for defendant: That he was at the sale in 1845; negroes were then low; those sold by defendant at said sale brought as much as negroes could then be sold for, for cash; said sale was fair to the best of his knowledge; there was a large crowd present; defendant finding that witness did not desire to purchase any of said negroes, furnished him with a list of negroes and prices attached, and requested witness to buy said negroes in for him, (defendant) if they sold for less than those prices; witness agreed to do so, with the understanding that he was not to be charged with said negroes or made liable for them; the property was cried a long time; specie funds were not required; negroes are oftener sold on credit at administrator's sales than for

cash ; cotton, in the spring of 1845, was worth 4½ to 6 cents, in 1844, from 9 to 10 cents.

Thomas Glover testified for defendant : That he was at the sale in 1845, and it was conducted fairly to the best of his knowledge; the negroes brought fair prices; witness was a bidder, but did not buy; would have bought if the negroes had sold low.

Lewis Solomon testified for defendant : That he was Clerk of the Court of Ordinary when letters of dismission were granted to defendant; the Court called on witness for the facts and witness, as Clerk, reported to the Court that defendant's citation had been published in terms of the law, and that defendant's accounts were regular, and that he had fully administered the estate; the Court relied on the statements of witness, and did not personally examine the accounts ; witness' rule was, when a return was made, to examine it and see that it was correct, and then to enter on the back thereof, "Officially examined and found correct," and report to the Court. Witness relied entirely on Mr. Shine's statements and returns under oath ; took it for granted they were correct, and had no other evidence; the Court never examined a single return of Mr. Shine, and witness received them under the oath of Mr. Shine.

Gustavus McCrea testified for defendant : That he was at the sale in 1838; the sale was fairly conducted, so far as he saw or knew, and the negroes sold for fair prices.

Dr. Dupree testified for defendant: That he was a creditor of Glenn at the time of his (Glenn's) death, to the amount of $3,000 00 or $4,000 00. Witness looked closely into the condition of the estate, and was apprehensive of losing a part of his debt by reason of the insolvency of the estate.

Matthew Little testified : That cotton, in the winter of 1845 sold for 4½ cents, and a year before for 10 cents.

The evidence having closed, the jury returned a verdict in favor of complainants for $6,500 00, and decreed that the negroes, Guilford, Henry, Mary, Wiley and Charles be re-sold, and half the proceeds paid to complainants.

Defendant moved for a new trial on the following grounds :

1st. Because the Court erred in admitting the testimony of Ware.

2d and 3d. Because the verdict is against the law and the evidence.

4th. Because the damages decreed by the jury are excessive.

5th. Because, in giving the following charge at defendant's request, in writing, to-wit: "It being in this case an admitted fact that defendant's intestate died in Twiggs county, and letters of administration on his estate were granted there, the Court of Ordinary of Twiggs had jurisdiction to grant leave to applicant to sell the negroes, and if such leave was granted, the order is good and valid in this case, unless procured by the fraud of defendant. It may have been illegal, but if the Court had jurisdiction of the case in this proceeding, such order, although illegal, is not therefore void." The Court refused to give the same except in connection with the further charge in explanation thereof, to-wit: "In order for defendant to have legally procured such order for leave to sell negroes, it was his duty to have published his application for such leave for the full period of four months, and if defendant procured such order to be passed, knowing at the time that said application had not been published for the full period of four months, this is such a fraud as will vitiate said order." And the Court further charged, that "the defendant could not petition legally for a citation to be issued, nor could a citation be issued until he had fully discharged the duties assigned to him, there is in the record no petition or order for a citation. If you should believe from the evidence that the citation was published before his returns were completed, and that returns were made after the publication, and that no citation was published after his final returns were made, the publication, the Court charges you, was illegal, and should you believe, in addition to the above facts, that the defendant had made any false returns, such as returning property purchased by others when the same was, in fact, purchased by himself, and that he made any misrepresentations, or such were made by any one within his knowledge to the Court, and he knowingly availed himself of it to procure an illegal order of discharge and thereby procuring the same before it could be lawfully granted by the Court, and this to the prejudice of complainants, the Court charges you, that these circumstances would authorize you to set aside such order of discharge on the ground of fraud."

6th. Because the Court charged the jury, that it was ne-

cessary to the legality of an administrator's sale of negroes, that such sale should be advertised for sixty days after the passing of such order granting him leave to sell, and such advertisement could not be run cotemporaneously with an application for leave to sell; and that a sale without such previous advertisement, however otherwise fair and for full value, is null and void.

7th. Because the Court refused to give the following charge as requested in writing: "An administrator in Georgia may buy at his own sale, he being the highest bidder, so the sale is otherwise legally conducted, if it be shown that the sale was fair, *bona fide* and free from all fraud, and that the property so bought sold at the time for its full and fair value; and if the jury shall so believe in this case, then complainants are entitled to no relief in this case by reason of such sale and purchase by the administrator."

8th. Because the Court refused to charge the following written request of defendant: "As to the negroes, Pool and Charlotte—complainant making no controversy as to Bill, Lydia and child—if the jury shall believe they were fairly and without fraud bought by defendant at his own sale, and that said negroes were thereafter fairly and *bona fide* resold to others, then defendant must account for the profits he made by his bargain in the purchase and resale of the negroes, and if the jury shall believe from the evidence that the defendant has fairly accounted for and disbursed such profits in the administration of said estate, then complainants are entitled to no relief in the case made by their bill touching the sale and purchase of said negroes." And because the Court, in lieu thereof, charged the jury, "that the measure of damages and relief in such a case as to negroes bought by an administrator at his own sale and resold, is the value of negroes at the time of the trial, and hire from the time of such purchase up to date, subject to the deduction of the price paid by the administrator for the negroes, and interest thereon, which in this case would be eight per cent.

9th. Because the Court refused to charge the following written request by defendant: "As to the negroes, Harriet and Esther, if the jury shall believe from the evidence that they were purchased by defendant at his own sale, and that said sale was otherwise a legal sale, and that, without any

notice of complainants' intention to call in question said sale, he fairly and *bona fide*, and without fraud, parted with the possession of, and all right to control, said negroes by gift to children, then the measure of damages and relief in this case is one-half of the difference between the price at which defendant purchased them and their actual value, if more, at the time of such purchase, with interest and half the value of hire during that time, less expense of keeping small negroes." And because the Court, in lieu thereof, as to measure of damages and relief, charged the same as already stated as to the negroes, Pool and Charlette, bought by defendant at his own sale, and afterwards resold by him.

10th. Because the Court refused to charge the following written request of defendant: " As to the negroes, Harriet and Esther, if the jury shall believe from the evidence that the defendant purchased them at his own sale fairly and without fraud, and that the sale was otherwise legal, and that the defendant parted with said negroes, and that the same were, at the time of filing this bill, entirely beyond his control, and this without notice on his part of any intention on the part of complainants to question said sale, then the measure of damages and relief is the difference between one-half of the price at which said negroes were so purchased, and interest thereon upon the one side, and half the value of said negroes and increase at the time of said gift and loss of possession, together with half the hire thereof between the time of purchase and gift, less half the expenses of taking care of said negroes and raising said increase during that time, on the other side."

The Court refused to grant a new trial, and defendants excepted.

B. HILL and CROCKER, for plaintiffs in error.

B. H. HILL, *contra.*

*By the Court.*—LUMPKIN, J., delivering the opinion.

This is a suit brought by Columbus L. Redwine and wife, calling upon Daniel W. Shine, the administrator of Robert F. Glenn, deceased, the father of Mrs. Redwine, to account, and charging him with multiplied acts of mismanagement;

and especially with having bought at his own pretended sales, large and valuable portions of the estate, which he now holds, or has appropriated to his own use.

The testimony consists mainly of the defendant's own answer. Much time has elapsed since the date of these transactions, and we purpose, without going into detail, to discuss the following propositions, to-wit. :

1. Has an administrator in the State the right to buy property at his own sale?

2. When an administrator has failed to comply with the law in selling property, is he held to a more rigid responsibility, when the property of the estate is purchased by himself, than by other persons?

3. What is the rule or measure of damages when the administrator buys trust property himself and sells it again, and otherwise appropriates it to his own use?

It is contended by the counsel for the plaintiff in error, that it never has been decided by this Court, that an executor or administrator could not purchase property at his own sale—the transaction being free from all fraud. And it is alleged as error in the Judge, that he refused to charge the jury upon request, that he could so buy, the sale being *bona fide*, and the trustee the highest bidder.

Let us settle this question *in limine*.

The case of *Worthy and others, against Johnson and others*, 8 *Ga. Rep.*, 238, was this:

Thomas Worthy died. His heirs filed their bill against certain purchasers of negroes sold by his executor at public sale, and against the present holders of certain other slaves, that were bought by the executors at their own sale, and which were subsequently sold by the sheriff as the property of the executors. The bill was demurred to on various grounds; and amongst other things, for want of equity, the Court sustained *each* of the grounds of demurrer, and this decision was excepted to and brought to this Court by writ of error.

Thus it will be perceived that the point was legitimately presented, as to the right of a representative to buy at his own sale. And this Court, upon full consideration, and upon argument and authority, thus disposed of the question—"Can an executor or administrator become a purchaser at his own sale?" In some of the States it has been decided

that such sales are *per se* void. And the Legislature of this State, by a recent statute in relation to sheriffs, have gone far to sanction this principle. They have not only prohibited sheriffs from buying at their own sales, but declared all such purchases absolutely void; and, in addition, subjected the officer to a public prosecution and severe punishment upon conviction for a violation of the law. And much might be said in support of this statute upon the score of public felony.

"The doctrine, however, maintained as it respects this class of trustees by this Court, is this: that where a purchase is made by a trustee, on his own account of the *cestui que trust,* although sold at public action, it is in the option of the *cestui que trust* to set aside the sale, whether *bona fide* made or not; that it is voidable only, and not absolutely void." It is added—"the heirs should make their election within a reasonable time; otherwise, they would be precluded."

This, then, is the unanimous doctrine held by this Court, notwithstanding *obiter dicta* to the contrary. And it is the unanimous judgment of the present bench upon this point. We differ merely as to the rule of damages.

The case of *Fleming and others against Foran and another,* 12 *Ga. Rep.,* 594, goes further. It was then held by a full bench, that "an executor cannot become the purchaser of land sold under an execution against his testator; but the sale will be set aside, however fair and honest, on the application of the legatees, provided such application is made in a reasonable time; otherwise, it will be considered as a waiver or abandonment of the right."

We commend the reasoning in this last case to careful consideration.

Having disposed of this preliminary question, we would remark, that every other fundamental exception in this case depends upon the settlement of a single principle. It is considered that Shine, the administrator of Glenn—and if it is denied, we are fully warranted by the record in assuming the fact—did not comply with the law, which is the rule of his conduct, in a single particular. He obtained the order ordering the first sale prematurely; the second sale was made after the order had expired—seven years having intervened—and he obtained his letters of dismission on the same

day that his final return was made.    To all intents and purposes, then, so far as he is concerned, and it is the same thing as if he acted throughout without authority or leave, and his liability is to be judged of in the same way; and just here is the point upon which his accountability turns.

Ordinarily, although the trustee fails to observe the requisitions of the law, still, if he can show that no injury resulted to the *cestui que trust,* by reason of the irregularity, he will, *perhaps,* be protected.    Not so, however, where he becomes the purchaser of the trust property.    And by a firm adherence to this salutary distinction, much mischief will be prevented by laying the axe to the root of the temptation to selfishness.    Heirs and legatees do not litigate upon equal terms when they are called upon, as these complainants are, to contest with the administrator the *bona fides* of transactions which transpired twenty years since.    Whether they be false or fair, erroneous or otherwise, all that is required of them is, to show that the order for the sale of the intestate's negroes was fraudulently obtained and fraudulently executed; and this they do, when they prove that the administrator utterly failed to comply with the law in each and every instance; and that he became the purchaser of the property himself—directly, or indirectly through others—under such circumstances, he is chargeable with the present full value of the estate sold under those illegal orders, with interest, and his illegal dismission will not screen him from accounting. Or, if any of the property is still in his possession to convey the same to the complainants—or, if this can only be effected by a sale—to distribute the moiety of the proceeds to which the complainants are entitled.

In this way only can the stern policy be maintained, which the law adopts to guard the rights of infants from invasion, and which it will not allow to be disregarded, or set at nought with impunity.

And it is in vain for the administrator to seek to shield himself behind the *ex parte* proceedings of the Ordinary. These cannot shelter the trustee from the irregularity in his actings and doings.    The Court presumes any thing right. The party acts at his peril, if it is not.    If the Court is wanting in vigilance, the party must not be wanting in duty.

As to the measure of damages, then, we think it not clear that the complainants are entitled to recover the present value

of the negroes which he has sold or given away, with hire. In *Bell vs. Bell and others,* (20 *Ga. Rep.,* 250,) every thing was regular. Still, for the purpose of discouraging fraudulent administrations, procured by the trustee for the selfish purpose of possessing himself of the intestate's property, and not for the benefit of the heirs and creditors. This Court held the trustee responsible for the value of the land at the time of filing the bill, with interest. (See also *Daniel vs. Sapp, ib.* 574.

And the cases in the books go even beyond this, and allow the jury to give special damage, beyond even the original value of the chattels (3 *Burr,* 1363; 2 *Black. Rep.,* 902; 1 *Atkin,* 429.) Even when the trustee has not acted from unfair motives, still, if he has sold the property contrary to his trust, he will be decreed to pay the utmost value. If he still holds the property, he will be compelled at the election of the *cestui que trust,* to convey it. The rule is different between breaches of contract and breaches of trust, as regards damages.

It may be said that in *Dorsett vs. Frith,* 25 *Ga. Reports, p.* 537, we held an execution *de son tort* only liable for the purchase money with interest. Mark the difference—Frith was not a purchaser at his own sale; he owned an interest in the slave sold by him ; and while his conduct was characterized by the utmost good faith throughout, that of the adverse claimant was oppressive in the extreme. And, yet, Judge McDonald dissented from the rest of the Court, even in that case, on account of the rule as to the damages being too indulgent.

But, admitting the law to be as we have laid it down, it has not been observed by the jury in making up their decree, as the calculation demonstrates. Allow to complainants the enhanced value of Pool, Charlotte and children, the negroes sold, and how stands the account ?

SHINE.                                    *Cr.*

By total amount of debts paid as per all his returns..$7,401 70

LESS ASSETS AS FOLLOWS:

Sale of perishable property...................$1,481 62
Hire of negroes returned........................ 320 75
Notes and accounts collected.................. 227 57

Shine *vs.* Redwine and wife.

Account of negroes when sáles are affirmed :

| | | |
|---|---|---|
| Man Bell sold for | 465 | 00 |
| Lydia and child | 861 | 00 |
| Harriet | 626 | 00 |
| Henry | 400 | 00 |

$4,383 74

| | | |
|---|---|---|
| Net balance of debts | 3,017 | 96 |
| Add interest at 8 per cent | 4,828 | 60 |

$7,866 56

SHINE.  *Dr.*

| | | |
|---|---|---|
| Harriet and 7 children, value and hire (by Paul) | $5,562 | 00 |
| Pool | 3,167 | 00 |
| Esther and two children | 3,060 | 00 |
| Charlotte and child, (by McAllen) | 4,500 | 00 |
| Guilford, hire only, (by Paul) | 2,200 | 00 |
| Henry, Blacksmith | 4,000 | 00 |
| Wiley | 1,667 | 00 |
| Mary | 700 | 00 |
| Charles | 1,575 | 00 |

| | | |
|---|---|---|
| | $26,451 | 00 |
| Deduct debts and interest as above | 7,845 | 56 |

| | | |
|---|---|---|
| Net balance | $18,604 | 44 |

| | | |
|---|---|---|
| One-half to complainants | $ 9,302 | 22 |

So ought to have been the verdict upon the maximum hypothesis. We take the statement, not allowing complainants the enhanced value of Pool, Charlotte and children :

SHINE.  *Cr.*

| | | | |
|---|---|---|---|
| Total debts as before | | $7401 | 70 |
| Credit as previous statement | $4,383 74 | | |
| Add Pool's sale | 250 00 | | |
| Charlotte | 365 00 | | |
| Profit on the resale of two last | 184 00 | $5,182 | 74 |

| | | |
|---|---|---|
| Net balance of debts | 2,218 | 76 |
| Interest on this sum at 8 per cent | 3,548 | 40 |

$5,767 16

Shine *vs.* Redwine and wife.

| SHINE. | | Dr. |
|---|---|---|
| To sale and hire as by former statement, | | $26,451 00 |
| Less Pool's value and hire.............$3,167 00 | | |
| Charlotte and children.................... 4,500 00 | | $7,667 00 |
| Net value and hire, leaving out Pool and Charlotte...... ..................... | | 18,784 00 |
| Deduct debts and interest as his former calculation........................ | | 5,767 16 |
| Total net debit........ ............. | | $13,006 84 |

One-half to complainants.............................. $6,508 42

The verdict of the jury is for $6,500 00, being just $8 42 too small, after leaving out Pool and Charlotte, which the jury undoubtedly did. It will be noticed, too, that no interest is calculated on the hire, which ought to be regarded as falling due annually. This would largely increase the amount.

So, then, under any view of the law, there is no earthly pretext for granting a new trial.

It only remains to add, that, in the opinion of the Court, Shadrach Ware was not disqualified on the score of interest from testifying in behalf of complainants on the trial of this case. True, he married the widow of Glenn and the mother of the complainant, Mrs. Redwine; but he will neither be gainer or looser by the event of this suit. Neither can the decree rendered be given in evidence for or against him on any other trial..